**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Insight Renewal Center, LLC, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | CLASS ACTION COMPLAINT |
| Change Healthcare Inc., UnitedHealth Group Incorporated, UnitedHealthcare, Inc., and Optum, Inc., | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Insight Renewal Center, LLC ("Plaintiff"), individually and on behalf of the Class defined herein of similarly situated healthcare providers ("Class Members"), alleges the following against Defendants Change Healthcare Inc. ("Change"), UnitedHealth Group Incorporated ("UHG"), UnitedHealthcare, Inc. ("UnitedHealthcare"), and Optum, Inc. ("Optum") (collectively, "Defendants") based upon corporate knowledge with respect to itself and on information and belief as to all other matters:

## **INTRODUCTION**

1. Defendants were at a heightened risk of—and an obvious target for—a cyberattack. This action arises from Defendants' failure to secure and safeguard their information systems from a massive foreseeable cyberattack that impacted Plaintiff's and Class Members' business operations.

2. Defendant Change—a unit of UnitedHealth's Optum subsidiary—is a health

technology giant that provides revenue and payment cycle management services that lie at the heart of the U.S. healthcare system. Change's services connect payers, providers, pharmacies, and patients. The services are critical to providing healthcare throughout the country.

3.    Change is known to be the largest clearinghouse for insurance billing and payments in the United States, processing approximately 50% of the nation's medical claims for approximately 900,000 physicians, 33,000 pharmacies, 5,500 hospitals, and 600 laboratories across the U.S. healthcare system.[1] Change is also regarded as the nation's largest commercial prescription processor, working with thousands of insurance companies, doctors, pharmacists, and hospitals to help determine patient responsibility for payment and handling one in every three patients records.[2]

4.    According to Change, its platform is "At the Center of the Healthcare Ecosystem," it processes 15 billion health care transactions annually—including a range of services that directly affect patient care, such as clinical decision support, eligibility verifications, and pharmacy operations—touches one out of every three U.S. patient records, and its "cloud-based network supports 14 billion clinical, financial, and operational transactions annually."[3]

---

[1] *US health department opens probe into UnitedHealth hack*, REUTERS, (Mar. 13, 2024), https://www.reuters.com/technology/cybersecurity/hhs-opens-probe-into-hack-unitedhealth-unit-2024-03-13/ (last visited Apr. 17, 2024).

[2] *4 Lessons We Learned From The Change Healthcare Cyberattack*, MEDCITY NEWS, (Apr. 7, 2024), https://medcitynews.com/2024/04/change-healthcares-cyberattack-cybersecurity/ (last visited Apr. 17, 2024).

[3] Defendants create, collect, transmit, and maintain exorbitant amounts of personal identifiable information ("PII") and protected health information ("PHI" and, collectively

5.    On February 21, 2024, UnitedHealth, the nation's largest insurer, filed a Form 8-K with the Securities and Exchange Commission disclosing that Change's systems had been infiltrated and that Private Information in possession of Change had been obtained by an unauthorized party. On or about that date, Change's systems were accessed by cybercriminals, upon information and belief, due to exploitation of known vulnerabilities in ConnectWise ScreenConnect,[4] identified as CVE-2024-1708 and CVE-2024-1709 (the "Data Breach").

6.    Following days of public speculation and outrage, Defendants subsequently confirmed that the Data Breach was a ransomware incident, wherein the cybercriminals accessed Change's systems and encrypted Change's (and, upon information and belief, multiple other entities') data to hold it hostage with the goal of securing a large ransom payment.

7.    The Cyberattack, against one of America's largest healthcare companies was described by the American Hospital Association as "the most serious incident of its kind

---

with PII, "Private Information"). The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, but not limited to, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). The Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations (collectively, "HIPAA"), generally defines "protected health information" as all individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations.

[4] StreetConnect is a popular remote desktop software with both on-premises and in-cloud deployments.

leveled against a U.S. health care organization."[5]

8.      As Defendants struggled to bring their systems back online, thousands of healthcare providers throughout the U.S. were locked out of processing payments and, in turn, "struggling to get paid" following the Data Breach outage. In the meantime, thousands of doctors, hospitals, and other healthcare providers that depend on Change for billing reimbursements remained paralyzed and scrambling without access to Change's mission-critical services, resulting in overdue payments, interest accumulation, and other financial harm.[6]

9.      On or about February 28, 2024, cybercrime group "Blackcat" (also known as "ALPHV," referred to hereinafter as "ALPHV Blackcat") claimed credit on its darknet site for the Cyberattack, asserting that it accessed Defendants' systems and stole millions of sensitive records, including medical insurance and health data on thousands of consumers,

---

[5] As the result of the Cyberattack, hospitals, healthcare providers, and pharmacies (including CVS Health and Walgreens) throughout the United States immediately reported their inability to fulfill or process prescriptions through patients' insurance. By way of example, Tricare, the U.S. military's health insurance provider for active military personnel, said in a statement that the ongoing Data Breach was "impacting all military pharmacies worldwide and some retail pharmacies nationally." Similarly, as a result of the Cyberattack, pharmacies and providers were unable to process drug manufacturer coupons and "co-pay" cards, leaving uninsured or under- insured patients without those critical payment mechanisms they rely on to afford expensive medications and treatments. *Who and what is the hack of UnitedHealth's tech unit affecting?*, Reuters (March 6, 2024) https://www.reuters.com/technology/cybersecurity/who-what-is-hack-unitedhealths-tech-unit-affecting-2024-03-06/ (last visited March 28, 2024).

[6] *Why UnitedHealth, Change Healthcare were targeted by ransomware hackers, and more cybercrime will hit patients, doctors* (March 15, 2024) https://www.cnbc.com/2024/03/15/why- unitedhealth-change-healthcare-were-targets-of-ransomware-hackers.html (last visited March 18, 2024).

healthcare providers, pharmacies, and insurance providers. After the Data Breach, another ransomware group called RansomHub posted four terabytes of data stolen from Defendants to its dark-web site. RansomHub claims to be unaffiliated with ALPHV Blackcat and is threatening to sell that stolen data if Defendants' do not pay a ransom.[7] It is unclear at the time this Complaint was filed whether there was an additional cyberattack, or further dissemination of data already stolen by ALPHV Blackcat.[8] It could be the result of another cyberattack or "a kind of cautionary tale about the dangers of trusting ransomware groups to follow through on their promises, even after a ransom is paid."[9]

10.    The attack was entirely foreseeable and avoidable. On February 19, 2024, ConnectWise had issued a security advisory specifically alerting users of a remote code execution (RCE) flaw—i.e., vulnerabilities CVE-2024-1708 and CVE-2024-1709—that could be leveraged to bypass authentication in ScreenConnect servers, and advised its customers of the need to patch their ScreenConnect servers immediately against the "critical vulnerability"[10] to prevent RCE attacks. ConnectWise's alert categorized the vulnerability as a "high" priority and recommended installing updates as emergency changes or as soon as possible.

---

[7] *Change Healthcare Targeted by Second Ransomware Attack*, PYMNTS, (April 14, 2024) https://www.pymnts.com/cybersecurity/2024/change-healthcare-targeted-by-second-ransomware-attack/ (last visited Apr. 15, 2024).
[8] *Id.*
[9] *Change Healthcare Face Another Ransomware Threat—and it Looks Credible*, WIRED, April 12, 2024, Change Healthcare Faces Another Ransomware Threat—and It Looks Credible | WIRED (last visited Apr. 15, 2024).
[10] A vulnerability is categorized as "critical" if it could allow the ability to execute remote code or directly impact confidential data or critical systems.

11.    Indeed, in a Joint Cybersecurity Advisory issued on December 19, 2023, the Federal Bureau of Investigation ("FBI") and the Cybersecurity & Infrastructure Security Agency ("CISA") encouraged critical infrastructure organizations, such as Defendants, to implement their various recommendations as set forth in the advisory to reduce the likelihood and impact of inevitable ALPHV Blackcat cyberattack efforts. The FBI and CISA provided various step-by-step technical details associated with the ALPHV Blackcat criminal organization and its attack techniques, and advised organizations of "actions to take today," which included "prioritize remediation of known exploited vulnerabilities."[11]

12.    Notwithstanding these publicized high-priority, emergent, and critical warnings, Defendants failed to take reasonable, timely and appropriate measures to protect against the foreseeable, catastrophic Cyberattack, including remediation ("patching") of the known vulnerabilities. As discussed herein in detail, among other failures, Defendants failed to heed credible security warnings; failed to maintain adequate patch management policies and procedures; failed to detect alerts in regard to vulnerabilities affecting its systems; and failed to properly update and patch third-party software, update software regularly, implement third-party patches when issued, and prioritize patches by the severity of the threat.

13.    Plaintiff and the Class Members are healthcare providers injured as a result of the disruption to their access to Defendants' insurance claims clearinghouse,

---

[11] *See* FBI and CISA Joint Cybersecurity Advisory (December 19, 2023), available at: joint- cybersecurity-advisory-tlp-clear-stopransomware-alphv-blackcat-12-19-2023.pdf (aha.org).

Defendants' failure to timely and adequately process and pay amounts due and owing to Plaintiff and the Class Members for their healthcare services and products, and other financial loss caused by the disruption to Defendants' networks and transactional services.

14.    At this time, Plaintiff has not been advised whether its or its patients' confidential information has been compromised. If and when Plaintiff is so advised, it will provide appropriate notices and fully reserves the right to amend to address Defendants' additional liability for any such compromise of its or its patients' confidential information.

15.    As a direct and proximate result of Defendants' failures, Plaintiff and the Class Members have suffered and will continue to suffer serious injury.

16.    Accordingly, Plaintiff, on behalf of itself and the estimated thousands of similarly situated healthcare providers victimized by the Cyberattack, seeks to hold Defendants responsible for the injuries suffered as the result of their misconduct and failure to act, and demands appropriate monetary, equitable, injunctive, and declaratory relief.

## **JURISDICTION & VENUE**

17.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 putative members in the proposed class, and at least one Class Member (e.g., Plaintiff) is a citizen of a state different from any Defendant.

18.    The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged are part of the same case or controversy.

19.    The Court has personal jurisdiction over Defendants because UnitedHealthcare Inc., Optum Inc., and Change Healthcare are each owned by UnitedHealth Group Incorporated. UnitedHealth Group Incorporated is headquartered in this district. This Court has general and specific jurisdiction because UnitedHealth Group Incorporated has its corporate headquarters in Minnesota.

20.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant UnitedHealth Group Incorporated maintains its principal place of business in this District and therefore resides in this District pursuant to 28 U.S.C. § 1391(c)(2). A substantial part of the events or omissions giving rise to the Class's claims also occurred in this District.

## PARTIES

21.    Plaintiff Insight Renewal Center, LLC is an Arkansas limited liability company that provides therapy-related healthcare services. Its principal place of business is located in Little Rock, Arkansas.

22.    Defendant Change Healthcare, LLC is a limited liability company that provides healthcare IT services, including security consulting and risk management. Its principal place of business is located in Nashville, Tennessee. Change Healthcare is owned by UnitedHealth Group Incorporated, which is headquartered in Minneapolis, MN.

23.    Defendant UnitedHealthcare, Inc. is a Delaware corporation with its principal place of business in Minnetonka, Minnesota.

24.    Defendant Optum, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.

## FACTUAL ALLEGATIONS

25.    Change Healthcare is a healthcare technology company that works across the U.S. health system "to make clinical, administrative and financial processes simpler and more efficient for payers, providers, and consumers." [12] Change Healthcare offers healthcare providers such as doctors, hospitals, therapists, pharmacies, laboratories, and clinics services and support in key areas such as provider claim processing, pharmacy claim transactions, verification of insurance, disbursement of provider payments, and authorizations and medical necessity reviews. Healthcare providers utilize Change Healthcare's services either through a direct contractual relationship or indirectly through third-party intermediaries.

26.    According to the Change Healthcare website, its "extensive network, innovative technology, and expertise inspire a stronger, better coordinated, increasingly collaborative, and more efficient healthcare system." It bills itself as a "trusted partner for organizations committed to improving the healthcare system through technology."

27.    Change Healthcare also represents to providers that its "advanced technology and services help . . . enhance patient engagement and access, improve outcomes, drive revenue performance, and improve operational efficiency." Change Healthcare represents to payers that its "advanced technology solutions and services help payers achieve their priorities across the member journey." Change Healthcare promises its partners that its

---

[12] *Information on the Change Healthcare Cyber Response*, UNITED HEALTH GROUP, (Apr. 16, 2024), https://www.unitedhealthgroup.com/ns/changehealthcare.html (last visited Apr. 17, 2024).

"advanced technology solutions empower our partners to achieve their strategic business objectives and meet their customers' needs." And it assures patients that its "solutions streamline the engagement, care, and payment experience to improve the patient journey."

28.    Change Healthcare processes 15 billion healthcare transactions annually and touches one in every three U.S. patient records through its clinical connectivity solutions.

29.    Previously, Change Healthcare was an independent company that was not owned by any particular healthcare provider or insurer. In 2021, Defendant UnitedHealth Group ("UHG") proposed a deal to acquire Change Healthcare for a merger with Optum, a healthcare provider and subsidiary of UHG.

30.    Melinda Reid Hatton, AHA Vice President and General Counsel, voiced concerns about the proposed deal and wrote to the Department of Justice ("DOJ") asking it to investigate. In the letter to the DOJ, Ms. Hatton wrote, "The proposed acquisition would produce a massive consolidation of competitively sensitive healthcare data and shift such data from Change Healthcare, a neutral third party, to Optum."[13]

31.    The DOJ investigated and filed a complaint to stop UHG's transaction. In its complaint, the DOJ described Change Healthcare as a technology company that operates "the nation's largest electronic data interchange (EDI) clearinghouse, which transmits data between healthcare providers and insurers, allowing them to exchange insurance claims, remittances, and other healthcare-related transactions . . . It has access to a vast trove of

---

[13] *See* https://www.darkdaily.com/2021/04/07/aha-expresses-opposition-to-merger-between- unitedhealth-groups-optuminsight-and-change-healthcare-doj-agrees-to-look-into-the-13b-deal/ (last visited March 28, 2024).

competitively sensitive claims data that flows through its EDI clearinghouse—over a decade's worth of historic data as well as billions of new claims each year."[14]

32.    Moreover, according to the DOJ, "50 percent of all medical claims in the United States pass through Change's EDI clearinghouse.[15] Change's self-described 'pervasive network connectivity,' including approximately '900,000 physicians, 118,000 dentists, 33,000 pharmacies, 5,500 hospitals and 600 laboratories,' means that even when United's health insurer rivals choose not to be a Change customer, health insurers have no choice but to have their claims data pass through Change's EDI clearinghouse. Not only does Change process vast amounts of competitively sensitive claims data, but it also has secured 'unfettered' rights to use over 60 percent of this data for its own business purposes including, for example, using claims data for healthcare analytics. Additionally, through its claims editing product, Change has access to the proprietary plan and payment rules for all of United's most significant health insurance competitors."[16]

33.    The DOJ, however, lost its challenge to UHG's acquisition of Change Healthcare after a district judge ruled in UHG's favor and the DOJ chose not to appeal.

34.    In October 2022, Optum completed its combination with Change Healthcare. According to a press release UHG issued, "The combined businesses share a vision for achieving a simpler, more intelligent, and adaptive health system for patients, payers, and care providers. The combination will connect and simplify the core clinical, administrative,

---

[14] *See* https://www.justice.gov/atr/case-document/file/1476901/dl (last visited March 28, 2024).
[15] *Id.*
[16] *Id*.

and payment processes health care providers and payers depend on to serve patients. Increasing efficiency and reducing friction will benefit the entire health system, resulting in lower costs and a better experience for all stakeholders."[17]

## A.   The February 2024 Breach Leads to the Shutdown of Critical Healthcare Infrastructure.

35.     On February 21, 2024, Defendants discovered the Data Breach and that their computer networks were not secure and could not protect PHI and PII as required by state and federal law.   UHG set up a website regarding the Data Breach at www.unitedhealthgroup.com to announce the Data Breach and stated that it disconnected the Change Healthcare systems.[18] UHG made a similar statement in a filing with the U.S. Securities and Exchange Commission.[19] UHG also stated, "The Company has retained leading security experts, is working with law enforcement and notified customers, clients and certain government agencies . . . At this time the Company believes the network interruption is specific to Change Healthcare systems, and all other systems across the Company are operational."

36.     UHG initially claimed that a nation-state actor was responsible for the cyberattack. Blackcat, however, claimed responsibility for the Data Breach and stated on its dark web site that it had stolen the confidential health and personal identifying

---

[17] *See* https://www.optum.com/en/about-us/news/page.hub.optum-and-change-healthcare-complete-combination.html (last visited March 28, 2024).

[18] *See* https://www.unitedhealthgroup.com/newsroom/2024/2024-03-07-uhg-update-change-healthcare-cyberattack.html (last visited March 28, 2024).

[19] *See* https://www.sec.gov/Archives/edgar/data/731766/000073176624000045/unh-20240221.htm (last visited March 28, 2024).

information relating to millions of Americans.

37.    Specifically, Blackcat said it gained access to 6TB of data, including medical records, and payment and claims information containing personally identifiable information like names, contact information such as phone numbers and email addresses, and Social Security Numbers.

38.    Blackcat also claimed to have stolen Change Healthcare's source code and the confidential and sensitive information of CVS Caremark, Metlife, Health Net, Federal Medicare, and Tricare.

39.    Below is the statement that Blackcat issued regarding the cyberattack, indicating that the group has reviewed a substantial amount of confidential medical and personal identifying information:

> Change Healthcare -
>
> Optum - UnitedHealth
>
> 2/28/2024, 4:19:59 PM
>
> UnitedHealth has announced that the attack is "strictly related" to Change Healthcare only and it was initially attributed to a nation state actor.
>
> Two lies in one sentence.
>
> Only after threatning [sic] them to announce it was us, they started telling a different story.
>
> It is true that the attack is centered at Change Healthcare production and corporate networks, but why is the damage extremely high? Change Healthcare production servers process extremely sensitive data to all of UnitedHealth clients that rely on Change Healthcare technology solutions. Meaning thousands of healthcare providers, insurance

providers, pharmacies, etc . . .

Also, being inside a production network one can imagine the amount of critical and sensitive data that can be found.

We were able to exfiltrate to be exact more than 6 TB of highly selective data. The data relates to all Change Health clients that have sensitive data being processed by the company.

The list of affected Change Health partners that we have sensitive data for is actually huge with names such as:

- Medicare

- Tricare

- CVS-CareMark

- Loomis

- Davis Vision

- Health Net

- MetLife

- Teachers Health Trust

- Tens of insurance companies and others

Anyone with some decent critical thinking will understand what damage can be done with such intimate data on the affected clients of UnitedHealth/UnitedHealth solutions as well, beyond simple scamming/spamming.

After 8 days and Change Health have [sic] still not restored its operations and chose to play a very risky game hence our announcement today.

So for everyone, both those affected and fellow associates. [sic] to understand what is at stake our exfiltrated data includes millions of:

- active US military/navy personnel PII

-     medical records

-     dental records

-     payments information

-     Claims information

-     Patients PII including Phone numbers/addresses/SSN/emails/etc ...

-     3000+ source code files for Change Health solutions (for source-code review gents out there)

-     Insurance records

-     many many more

UnitedHealth you are walking on a very thin line be careful you just might fall over.

PS: For all those cyber intelligence so called expert . . . we did not use ConnectWise exploit as our initial access so you should base your reports you tell people on actual facts not kiddi [sic] speculations.

40.    Screenshots of some of the data were reportedly shared as proof of the Data Breach. On February 28, 2024, UHG confirmed that the Data Breach was perpetrated by Blackcat.

41.    Blackcat has a reputation for engaging in "double extortion tactics," that is, exfiltrating confidential and sensitive data before using ransomware to encrypt the files.

42.    On March 7, 2024, two weeks after the breach, UHG said in a statement: "We are working aggressively on the restoration of our systems and services."[20] UHG also stated, "All of us at UnitedHealth Group feel a deep sense of responsibility for recovery

---

[20] *See* https://www.unitedhealthgroup.com/newsroom/2024/2024-03-07-uhg-update-change-healthcare-cyberattack.html (last visited March 28, 2024).

and are working tirelessly to ensure that providers can care for their patients and run their practices, and that patients can get their medications. We're determined to make this right as fast as possible."

43.     Shortly after Defendants publicly announced the Data Breach, the AHA issued a security advisory notifying members and the public that "**Change Healthcare has not provided a specific timeframe for which recovery of the impacted applications is expected**" (emphasis in original).[21] The AHA also recognized that hospitals and health systems "may be experiencing challenges with obtaining care authorizations for their patients, as well as delays in payment." It stated that it was in communication with the Department of Health and Human Services, including the Centers for Medicare & Medicaid Services, about "options to support patients' timely access to care and provide temporary financial support to providers. We also are having these discussions with Optum. We will provide more information as it becomes available."

44.     In a letter to Health and Human Services, the AHA stated that while the full scope was "unknown," the AHA expected impacts to be far-reaching given Change Healthcare's national presence.[22] The AHA also explained how the incident has affected healthcare providers in terms of being unable to collect revenue. "[W]ithout this critical revenue source, hospitals and health systems may be unable to pay salaries for clinicians and other members of the care team, acquire necessary medicines and supplies, and pay for

---

[21] *See* https://www.aha.org/2024-02-24-update-unitedhealth-groups-change-healthcares-continued-cyberattack-impacting-health-care-providers (last visited March 28, 2024).
[22] *See* https://www.aha.org/lettercomment/2024-02-26-aha-letter-hhs-implications-change-healthcare-cyberattack (last visited March 28, 2024).

mission critical contract work in areas such as physical security, dietary and environmental services," the AHA stated. "In addition, replacing previously electronic processes with manual processes will add considerable administrative costs on providers, as well as divert team members from other tasks. It is particularly concerning that while Change Healthcare's systems remain disconnected, it and its parent entities benefit financially, including by accruing interest on potentially billions of dollars that belong to health care providers."

45.    Antitrust experts have opined that the Data Breach shows why placing "one conglomerate at the center of multiple health care functions is inherently risky."[23]

46.    The Data Breach and resulting shutdown have had reverberations across the U.S. healthcare industry that continue today, and the fallout is placing healthcare providers in a precarious situation.

47.    Since the discovery of the vulnerabilities in Defendants' computer networks on February 21, 2024, many healthcare providers have been unable to submit claims to insurers for payment, and many have not received payments for claims submitted before February 21, 2024. One physician, Dr. Purvi Parikh, told CNBC that her practice has not been paid by insurers for her patients' visits, which creates problems for paying operational expenses like medical supplies and payroll.[24] Dr. Parikh said there were no immediate workarounds and that it could take weeks to change to a new platform.[25]

---

[23] *See* https://www.statnews.com/2024/02/27/change-healthcare-cyber-attack-reveals-consolidation-risks/ (last visited March 28, 2024).
[24] *Id.*
[25] *Id.*

48.    Licensed clinical social worker Jenna Wolfson reported that she has been unable to receive any payments due to the Data Breach and that many of her colleagues are facing the same problems.[26] According to Wolfson, "There are people right now that might not see payment on the work that they're doing today for months, and they still have an entire practice to keep above water."

49.    Dr. Margaret Parsons, a dermatologist at a 20-person practice in Sacramento, California, told KFF Health News that she and her colleagues have not been able to electronically submit claims for payment since February 21, 2024 and that the payment process for California's Medicare Program does not accept paper claims which usually take 3-6 months to process.[27] "We will be in trouble in very short order, and are very stressed," said Dr. Parsons.

50.    Dr. Stephen Sisselman, an independent primary care physician in New York, said, "How can you pay staff, supplies, malpractice insurance – all this – without revenue? It's impossible."[28]

51.    If the shutdown lasts a month, Jackson Health Systems, in Miami-Dade Florida, will be short on as much as $30 million in payments, according to its chief revenue officer.[29]

---

[26] *See* https://healthitsecurity.com/features/understanding-the-impact-of-the-change-healthcare-cyberattack-on-providers (last visited March 28, 2024).
[27] *See* https://www.npr.org/sections/health-shots/2024/03/09/1237038928/health-industry-ransomware-cyberattack-change-healthcare-optum-uhc-united (last visited March 28, 2024).
[28] *Id.*
[29] *Id.*

52.    According to the president of Florida Hospital Association, Mary Mayhew, her members built "sophisticated systems that are reliant on Change Healthcare,"[30] and that changing processes could take about 90 days during which they will have no cash flow. "It's not like flipping a switch," said Mayhew.

53.    On March 13, 2024, the AHA wrote to Senators Ron Wyden and Mike Crapo about the Data Breach. According to the AHA's letter, the downed systems "are hampering providers' ability to verify patients' health insurance coverage, process claims and receive payment from many payers, exchange clinical records with other providers, provide cost estimates and bill patients, and in some instances, access the clinical guidelines used in clinical decision support tools and as part of the prior authorization process."[31]

54.    Moreover, the AHA reported in its March 13th letter that in response to a recent AHA survey of hospitals with nearly 1,000 responses, "74% reported direct patient care impact, including delays in authorizations for medically necessary care."[32] Further, the AHA reported that:

> [H]ospitals, health systems and other providers are experiencing extraordinary reductions in cash flow, threatening their ability to make payroll and to acquire the medical supplies needed to provide care. In the same survey, 94% of hospitals reported that the Change Healthcare cyberattack was impacting them financially, with more than half reporting the impact as "significant or serious." Indeed, a third of the survey respondents indicated that the attack has disrupted more than half of their revenue. The urgency of this matter grows by the day.[33]

---

[30] *Id.*

[31] *See* https://www.aha.org/lettercomment/2024-03-13-aha-urges-more-congressional-action-help-providers-affected-change-healthcare-cyberattack (last visited March 28, 2024).

[32] *Id.*

[33] *See* https://www.aha.org/lettercomment/2024-03-13-aha-urges-more-congressional-

55.    To make matters worse, on March 18, 2024, ratings agency Fitch said that certain healthcare providers that use its services may see a hit to their credit profile as a result of the Data Breach's impact on cash flows.[34]

**B.    The Data Breach and the Resulting Harm were Foreseeable Risks of which Defendants were on Notice and Could have prevented.**

56.    Cybercriminals target the healthcare industry the most due to the treasure trove of confidential health and personal information maintained and stored by healthcare organizations. In 2023, the FBI reported 249 ransomware attacks in the healthcare industry.[35] Cyberattacks have doubled from 2016 to 2021 and have resulted in the exposure of personal health information for approximately 42 million patients.[36]

57.    The FBI warned healthcare stakeholders as early as 2014 that they are the target of hackers, stating "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[37]

58.    In 2017, the Department of Health and Human Services released a ransomware fact sheet making it clear to entities covered by the Health Insurance

---

action-help-providers-affected-change-healthcare-cyberattack (last visited March 28, 2024).

[34] *See* https://www.reuters.com/business/healthcare-pharmaceuticals/fitch-says-unitedhealth-unit-hack-could-hit-smaller-pharmacies-care-providers-2024-03-18/ (last visited March 28, 2024).

[35] *See* https://www.npr.org/sections/health-shots/2024/03/09/1237038928/health-industry-ransomware-cyberattack-change-healthcare-optum-uhc-united (last visited March 28, 2024).

[36] *See* https://www.ncbi.nlm.nih.gov/pmc/articles (last visited March 28, 2024).

[37] *See* https://publicintelligence.net/fbi-targeting-healthcare20(PII) (last visited March 28, 2024).

Portability and Accountability Act ("HIPAA") that "[w]hen electronic protected health information (ePHI) is encrypted as the result of a ransomware attack, a breach has occurred because the ePHI encrypted by the ransomware was acquired (i.e., unauthorized individuals have taken possession or control of the information), and thus is a "disclosure" not permitted under the HIPAA Privacy Rule."[38]

59.    Under the HIPAA Privacy Rules, a breach is defined as, "[t]he acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI."[39] Accordingly, a ransomware attack such as the one that occurred on February 21, 2024 is considered a breach under the HIPAA Rules because there was an access of PHI not permitted under the HIPAA Privacy Rule.

60.    A ransomware attack is also considered a "Security Incident" under HIPAA. Under the HIPAA Rules, a "Security Incident" is defined as "the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system." 45 CFR § 164.304. According to the Department of Health and Human Services, "[t]he presence of ransomware (or any malware) on a covered entity's or business associate's computer systems is a security incident under the HIPAA Security Rule."[40]

---

[38] *See* https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity/ransomware-fact-sheet/index.html (last visited March 28, 2024).
[39] *See* https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited March 28, 2024).
[40] *See* https://www.hhs.gov/hipaa/for-

61.    Data Breaches can be prevented. Approximately 80% of ransomware is delivered through email phishing attacks. Other means to deliver ransomware is through brute force attacks on open remote desktop protocol ports. To prevent ransomware attacks, organizations must provide training to their employees for the handling of suspicious emails. They can also disable macros, avoid storing passwords in plain text, and perform hunts and search for suspicious behavior in their networks, among other things.

62.    This is not the first time that the UHG family has dealt with a data breach. In May 2023, United HealthCare, a UHG subsidiary, had to notify members that protective health information may have been compromised due to a credential stuffing attack that occurred on the United Healthcare mobile app in February 2023.[41]

63.    Accordingly, Defendants knew, given the vast amount of PHI and PII that healthcare providers such as Plaintiff and Class Members acquire and transmit to Defendants directly or through vendors and that in turn, Defendants store and maintain, that they were a target for cybercriminals and should have taken all reasonable measures to avoid cyberattacks. Defendants also understood the risks posed by their insecure data security practices and computer networks, including that businesses that use the Change Platform to process insurance claims would be impacted by a breach and any related Platform shutdown. Defendants' failure to heed warnings and failure to adequately

---

professionals/security/guidance/cybersecurity/ransomware-
fact-sheet (last visited March 28, 2024).
[41] *See* https://www.hipaajournal.com/credential-stuffing-attack-exposed-united-
healthcare-member-data/ (last visited March 28, 2024).

maintain their computer networks secure resulted in the shutdown and harm to Plaintiff and Class Members.

**C.    Defendants, at all Relevant Times, had a Duty to Plaintiff and Class Members.**

64.    Defendants marketed their services to Plaintiff and Class Members, and were aware, at all relevant times, that healthcare providers such as Plaintiff and Class Members handle PHI and PII on a daily basis and that they are required by law to keep such data confidential.  Thus, Defendants were required by law to properly secure their computer networks and encrypt and maintain PHI and PII using industry standard methods, utilize available technology to defend their computer networks from invasion, and act reasonably to prevent foreseeable harms.

65.    Defendants' duty to use reasonable security measures arose as a result of the special relationship that existed between them, on the one hand, and Plaintiff and the other Class Members, on the other hand. The special relationship arose because Plaintiff and the members of the Class entrusted Defendants (or their partners who entrusted Defendants) with PHI and PII. Defendants had the resources necessary to prevent the Data Breach and to protect their computer networks but neglected to adequately invest in security measures, despite their obligations to protect such information. Accordingly, Defendants breached their common law, statutory and other owed duties to Plaintiff and Class Members.

66.    Defendants' duty to use reasonable security measures also arose under HIPAA. Defendants are covered by HIPAA and as such are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security

Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. Under HIPAA, Defendants were required to "reasonably protect" PHI from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

67.   Under HIPAA, Defendants were specifically required to do the following:

- Ensure the confidentiality and integrity of electronic PHI they created, received, maintained, and/or transmitted. 45 C.F.R. § 164.306(a)(1);

- Implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights. 45 C.F.R. § 164.312(a)(1);

- Implement adequate policies and procedures to prevent, detect, contain, and correct security violations. 45 C.F.R. § 164.308(a)(1)(i);

- Implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports. 45 C.F.R. § 164.308(a)(1)(ii)(D);

- Protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI. 45 C.F.R. § 164.306(a)(2);

- Protect against reasonably anticipated uses or disclosures of electronic PHI

that are not permitted under the privacy rules regarding individually identifiable health information. 45 C.F.R. § 164.306(a)(3);

- Ensure compliance with HIPAA security standard rules by its workforces. 45 C.F.R. § 164.306(a)(4);

- Train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI. 45 C.F.R. § 164.530(b); and/or

- Render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as Defendants had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304 definition of encryption).

68.     Defendants' duty to use reasonable security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data by entities like Defendants.

69.     The Data Breach and resulting shutdown of the Change Healthcare networks were a direct and proximate result of Defendants' failure to: (1) properly safeguard and protect computer networks with PHI and PII from unauthorized access, use, and disclosure,

as required by various state and federal regulations, industry practices, and common law; (2) establish and implement appropriate safeguards to ensure the security and confidentiality of PHI and PII; and (3) protect against reasonably foreseeable threats to the security or integrity of such information and computer networks.

**D.    Plaintiff's Experiences.**

70.    Plaintiff Insight Renewal Center, LLC is a licensed healthcare provider serving patients in Little Rock and central Arkansas.

71.    Plaintiff contracted with Therapy Notes, which offers an integrated practice management system that provides healthcare providers with tools to streamline their operations.

72.    Therapy Notes, in turn, partners with Change Healthcare to process insurance claims submitted by its clients, among other things. Specifically, healthcare providers such as Plaintiff submit their claims to Therapy Notes, which in turn uses Change Healthcare to process them with insurance and healthcare plans that then issue payment to providers, like Plaintiff.

73.    Beginning on or around February 21, 2024, when Defendants' systems were shut down because of the Data Breach, Plaintiff could no longer submit claims through Therapy Notes and obtain payments for those claims. Since the shutdown, Plaintiff has not been paid for claims despite continuing to treat patients. Plaintiff relies on the payments it receives from submitted claims to pay basic business expenses, including salaries and wages to its employees.

74.     As a result of Defendants' failure to maintain the security of their computer networks, Plaintiff has had to take out a loan and apply for a line of credit to meet payroll and pay other basic expenses. Plaintiff's staff resources have also been diverted to trying to resolve the cash flow problems caused by the shutdown of Defendants' computer networks.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action individually and on behalf of all other persons similarly situated (the "Nationwide Class") pursuant to the Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4).

76.     The Nationwide Class is initially defined as follows:

All healthcare providers in the United States whose use of Change Healthcare's services were disrupted by the data breach.

77.     Additionally, pursuant to the Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4), Plaintiff brings this action on behalf of the following Arkansas Class initially defined as:

All healthcare providers in the state of Arkansas whose use of Change Healthcare's services was disrupted by the Data Breach.

78.     The Nationwide Class and the Arkansas Class are referred to herein as "Class," unless otherwise stated.

79.     Excluded from the proposed Class are Defendants, any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs,

predecessors, successors, and assigns of Defendants; and judicial officers to whom this case is assigned and their immediate family members.

80.    Plaintiff reserves the right to re-define the Class definitions after conducting discovery.

81.    **Numerosity (Fed. R. Civ. P. 23(a)(1))**. The Class Members are so numerous that joinder of all members is impracticable. Based on information and belief, the Class includes over one million licensed healthcare providers. The parties will be able to identify the exact size of the Class through discovery and Defendants' records.

82.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3))**. Common questions of law and fact exist for each of the claims and predominate over questions affecting only individual members of the Class. Questions common to the Class include, but are not limited to, the following:

a.    Whether Defendants owed Plaintiff and the Class Members a legal duty implement and maintain reasonable security procedures and practices to protect PHI and PII;

b.    Whether Defendants breached their legal duties to Plaintiff and Class Members;

c.    Whether Defendants were negligent;

d.    Whether Plaintiff and Class Members conferred benefits on Defendants;

e.    Whether Defendants were unjustly enriched;

f.    Whether Plaintiff and Class Members are entitled to relief, including damages and equitable relief.

83. **Typicality (Fed. R. Civ. P. 23(a)(3))**. Pursuant to Rule 23(a)(3), Plaintiff's claims are typical of the claims of the Class Members. Plaintiff, like all Class Members, suffered harm as a result of the Data Breach and ensuing shutdown of Defendants' computer networks.

84. **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**. Pursuant to Rule 23(a)(4), Plaintiff and its counsel will fairly and adequately protect the interests of the Class. Plaintiff has no interest antagonistic to, or in conflict with, the interests of the Class Members. Plaintiff has retained counsel experienced in prosecuting class actions and data breach cases.

85. **Superiority (Fed. R. Civ. P. 23(b)(3))**. Pursuant to Rule 23(b)(3), a class action is superior to individual adjudications of this controversy. Litigation is not economically feasible for individual Class Members because the amount of monetary relief available to individual Plaintiff is insufficient in the absence of the class action procedure. Separate litigation could yield inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. A class action presents fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

86. **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)).** In the alternative, this action may properly be maintained as a class action, because (a) the prosecution of separation actions by individual members of the Class would create a risk of inconsistent and varying adjudication with respect to individual Class Members

which would establish incompatible standards of conduct for Defendants; or (b) the prosecution of separation actions would create a risk of adjudications with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or (c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

87.    **Issue Certification (Fed. R. Civ. P. 23(c)(4))**. In the alternative, the common questions of fact and law, set forth in Paragraph 83, are appropriate for issue certification on behalf of the proposed Class.

### CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of the Plaintiff, Nationwide Class, and Arkansas Class)**

88.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

89.    Defendants required sensitive information from both Plaintiff and the Class Members, and their respective patients receiving healthcare services, to perform their administrative and essential functions in connection with patients' healthcare. Defendants stored this data for the purpose of providing a platform for processing health insurance claims and other services to its customers for financial gain.

90.    Upon gaining access to the PHI and PII of Plaintiff's and Class Members and their patients' PHI and PII, Defendant owed to Plaintiff and the Class a duty of reasonable

care in handling and using this information and securing and protecting the information from being stolen, accessed, disclosed, and misused by unauthorized parties. Defendants acknowledged this duty in its privacy policies, where it expressly promised not to disclose sensitive personal information, including SSNs, without authorization and to adhere to all federal laws and regulations.

91.     Pursuant to its' duty, Defendant was also required to provide adequate data security, consistent with industry standards.  This includes designing, maintaining, and testing their security systems to ensure that these systems were reasonably secure and capable of protecting the patient PII and PHI provided to it by Plaintiff and the Class. Defendant further owed to Plaintiff and the Class a duty to implement systems and procedures that would detect a breach of their security systems in a timely manner and to timely act upon security alerts from such systems, including making their systems accessible in a reasonable amount of time following any breach.

92.     Defendant owed this duty to Plaintiff and the other Class Members because Plaintiff and the other Class Members compose a well-defined, foreseeable, and probable class of individuals whom Defendant should have been aware could be injured by Defendant's inadequate security protocols. Defendant actively solicited clients who entrusted Defendant with Plaintiff 's and the other Class Members' patient and other sensitive data when obtaining and using its services and products. To facilitate these services, Defendant used, handled, gathered, and stored the Plaintiff's and the other Class Members' information. As such, Defendant knew or should have known a breach of its

systems would cause damage to its clients and Plaintiff and the other Class Members. Thus, Defendant had a duty to act reasonably in protecting the information.

93.    Defendant also had a duty to protect Plaintiff's and the Class Members' information based on its representations that it could and would do so and on its knowledge that a repository of sensitive data could be targeted by hackers.

94.    Defendant also owed a duty to timely and accurately disclose to its clients and Plaintiff and the other Class Members the scope, nature, and occurrence of any cyberattack. This disclosure is necessary so Plaintiff and the other Class Members can take appropriate measures to avoid unauthorized use of sensitive information and/or take other steps in an effort to mitigate the harm caused by the Data Breach and Defendant's unreasonable misconduct, including, but certainly not limited to, preparing for system outages and disruptions like the ones that occurred as the result of the Data Breach.

95.    Defendant breached its duty to Plaintiff and the other Class Members by failing to implement and maintain security controls that were capable of adequately protecting the information at issue and further failing to timely restore access to their platform and services so customers could submit insurance claims.

96.    Defendants' failure to exercise reasonable care in protecting Plaintiff's and the other Class Members' information caused Plaintiff and the Class Members' harm. Indeed, patients' PHI would not have been compromised but for Defendants' unsecure network and systems, and Defendants' platform would not have been disconnected, or otherwise inaccessible, but for its breached duties described herein.

97.    The injuries to Plaintiff and the other Class Members were reasonably foreseeable to Defendant because laws and statutes, and industry standards require Defendant to safeguard and protect its computer systems and employ procedures and controls to ensure that unauthorized third parties did not gain access to Plaintiff 's and the other Class Members' information.

98.    The injuries to Plaintiff and the other Class Members also were reasonably foreseeable because Defendant knew or should have known that systems used for safeguarding sensitive and personal information were inadequately secured.  It was also reasonably foreseeable that Defendants' systems would be affected (i.e. locked, blocked, inaccessible or otherwise) and this would disrupt its clients' healthcare practices.  As such, Defendants' own misconduct created a foreseeable risk of harm to Plaintiff and the other Class Members.

99.    Defendant's failure to take reasonable steps to protect its systems and the Sensitive Information on those systems was a proximate cause of their injuries because it directly allowed third parties easy access to Plaintiff's and the other Class Members' information and resulted in a system shut down. This ease of access allowed third parties to steal information from Plaintiff and the other members of the Class, which directly resulted in the disruption of their respective practices and patient data dissemination.

100.    As a direct proximate result of Defendant's conduct, Plaintiff and the other Class Members have suffered injuries. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered damages, including missed payments and out-of-pocket expenses associated with (i) an inability to pay for basic business

operations, (ii) purchasing new healthcare payment software; (ii) notifying patients of data breach; (iii) late penalties assessed for untimely payment of expenses; and (iv) an inability to conduct business as usual. Furthermore, Plaintiff and Class Members' damages include time and effort spent researching and, in some cases, implementing new healthcare software(s).

**SECOND CAUSE OF ACTION**
**Negligence Per Se**
**(On Behalf of the Plaintiff, Nationwide Class, and Arkansas Class)**

101.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

102.    Defendants' unreasonable data security measures violates Section 5 of the FTC Act. Although the FTC Act does not create a private right of action, both require businesses to institute reasonable data security measures and breach notification procedures, which Defendants failed to do.

103.    Section 5 of the FTCA, 15 U.S.C. § 45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect sensitive health and financial data. The FTC publications and orders described above also form the basis of Defendants' duty.

104.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect sensitive health and financial data and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given

the highly sensitive nature and amount of data it stored on its services and the foreseeable consequences of a Data Breach should Defendants fail to secure its systems.

105.    Defendants' violation of Section 5 of the FTC Act constitutes negligence per se.

106.    Plaintiff and the Class are within the class of persons Section 5 of the FTCA (and similar state statutes) was intended to protect. Additionally, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. The FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same type of harm suffered by Plaintiff and the Class.

107.    As a direct and proximate result of Defendants' negligence per se, Plaintiff and the Class have suffered and continue to suffer injury.

**THIRD CAUSE OF ACTION**
**Breach of Contract**
**(On Behalf of the Plaintiff, Nationwide Class, and Arkansas Class)**

108.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

109.    Defendants, acting in their regular course of business, contract with healthcare providers, like Plaintiff and the Class Members,  in various sectors of the healthcare industry to provide their platform and services. Defendants' services allow it to, *inter alia*, interact with insurance companies for healthcare providers. Essentially, providers submit insurance claims through Defendants' platform, the claims are transmitted to insurance companies, and then the claims are processed and paid or denied.

110.    Plaintiff and the Class Members paid for Defendants' platform and services.

111.    In exchange for that payment, Plaintiff and the Class Members were promised access to and use of Defendants' platform and services.

112.    In February 2024, following the Data Breach, Defendants disconnected their platform and caused a disruption in their services to Plaintiff and other Class Members. Moreover, Defendants did not prewarn Plaintiff or the Class Members of the disruption, and therefore they were unable to prepare for the service disruption.  This breached Defendants' contractual obligations to Plaintiff and the Class Members to maintain a secure system for processing insurance claim payments.

113.    As a direct and proximate cause of Defendants' contractual breaches, Plaintiff and the Class Members suffered actual losses and damages, as described throughout this Complaint. Those damages include, but are not limited to losses related to the disruption of insurance claim collection services, and not receiving payments for care services.  Plaintiff and the Class Members alternatively seek an award of all other available damages, including nominal damages.

### FOURTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of the Plaintiff, Nationwide Class, and Arkansas Class)

114.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

115.    Plaintiff and Class Members have an interest, both equitable and legal, in their injuries that arose from Defendants' wrongful conduct, which includes Defendants' failure to safeguard their, and their patients' data and maintain an accessible platform for

Plaintiff and the Class to use for submitting insurance claims and collecting payments from patients.

116.    Plaintiff and Class Members paid Defendants for their services, and this constitutes a benefit to Defendants. Additionally, upon information and belief, Defendants continue to collect interest, either directly or indirectly, while the system remains inoperable.

117.    Defendants appreciated and had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

118.    In exchange for receiving Plaintiff's and Class Members' money, which provided Defendants commercial gain, Defendants should have supplied Plaintiff and Class Members with uninterrupted access and use of their platform and services. However, Defendants disconnected their platform and services following the Cyberattack.

119.    As a result of Defendants' conduct, Plaintiff and Class Members suffered actual damages as described herein.  It would be inequitable for Defendants to retain Plaintiff's and the Class Members' payments for services without providing those services. Thus, under principles of equity, Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds they received from Plaintiff and Class Members.

**FIFTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of the Plaintiff, the Nationwide Class, and the Arkansas Class)**

120.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

121.     Under the Declaratory Judgment Act, 28 U.S.C. §§2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious and which violate the terms of the federal and state statutes described above.

122.     An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendants' common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class. Plaintiff allege Defendants' actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

123.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a.   Defendants owed, and continues to owe a legal duty to secure the Sensitive Information with which it is entrusted, specifically including information pertaining to healthcare and financial records it obtains from its clients, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

   b.   Defendants breached, and continue to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal and financial information; and

    c.   Defendants' breach of its legal duty continues to cause harm to Plaintiff and the Class.

124.   The Court should also issue corresponding injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect its clients' (i.e. Plaintiff ' and the Class's) data.

125.   If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendants' data systems. If another breach of Defendants' data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the

126.   Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

127.   The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued.

128.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all others similarly situated, respectfully requests that the Court enter an order:

a. Certifying the Class as requested herein;

b. Appointing Plaintiff as Class Representative and undersigned counsel as Class Counsel;

c. Finding that Defendant engaged in the unlawful conduct as alleged herein;

d. That the Court grant permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

e. That the Court award Plaintiff and class members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

f. That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

g. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

h. That Plaintiff be granted the declaratory and injunctive relief sought herein;

i. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

j.  That the Court grant such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial in the instant action.

Respectfully submitted,

Dated: April 17, 2024

*/s/ Brian C. Gudmundson*
Brian C. Gudmundson (#336695)
Michael J. Laird (#398436)
Rachel K. Tack (#399529)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com
rachel.tack@zimmreed.com

Christopher D. Jennings*
**JENNINGS PLLC**
P.O. Box 25972
Little Rock, AR  72221
Telephone: (501) 247-6267
chris@jenningspllc.com

*Counsel for Plaintiffs and the Proposed Classes*

* *Pro Hac Vice forthcoming*